**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| DONALD ROBERTS, *et al.*, | § § | |
| Plaintiffs, | § § | |
| VS. | § § | CIVIL ACTION NO. H-03-4136 |
| GLENN WILSON, *et al.*, | § § | |
| Defendants. | § § | |

**MEMORANDUM AND ORDER**

This case arises out of the operation of competing baseball instruction facilities. Plaintiffs Donald Roberts and Roberts Plate L.L.C. d/b/a Home Plate sued defendants Glenn Wilson and Kenneth Ray Vaught, alleging violations of the Lanham Act, unfair competition, tortious interference with existing and prospective contracts, and civil conspiracy. Defendant Vaught crossclaimed against Wilson, (Docket Entry No. 25), and moved for summary judgment against Roberts, (Docket Entry No. 34). Roberts has responded to the summary judgment motion. (Docket Entry Nos. 38–40). Based on a close review of the motion, response, and reply, the summary judgment evidence, and the applicable law, this court grants summary judgment in favor of Vaught on the Lanham Act claim and rather than retaining the state law claims, dismisses them without prejudice. The reasons are stated below.

**I.     Background**

Roberts is the sole shareholder of Roberts Plate, L.L.C. In August 2001, Roberts Plate

purchased the assets of Home Plate, Inc. for $200,000. Home Plate included a baseball practice facility, baseball equipment, and trade names and trademarks. Roberts testified that when he purchased Home Plate, it was a successfully operating business, with a gross income of about $75,000 per quarter.

Roberts arranged with Glenn Wilson, a former professional baseball player, to provide baseball instruction at the Home Plate facility.[1] Roberts testified that he and Wilson made an oral agreement; there is no written agreement as to Wilson's role at the facility. The "deal" had "two prong[s]." (Roberts Dep. at 60). According to Roberts, Wilson agreed to a "90-day trial" during which Wilson would operate the Home Plate facility and Roberts would provide the funds. During this period, Wilson would receive an initial $7,500 loan from Roberts as "income" and would operate the facility and perform routine maintenance.[2]

The parties dispute what was expected to happen on July 31, 2003, at the end of the ninety days. Roberts testified that they agreed that Wilson would purchase the business for the agreed price of $150,000.

> The exact agreement that Glenn and I started with was that when
> he came into my facility, he'd have access to all my names of all

---

[1] Wilson was a first-round draft pick in 1980, and played for several major league teams between 1982 and 1993, including the Detroit Tigers, Philadelphia Phillies, Seattle Mariners, Pittsburgh Pirates, and Houston Astros. An outfielder with a .265 lifetime batting average, Wilson made the All-Star team in 1985.

[2] According to Roberts, Wilson was supposed to repay Roberts at the end of ninety days, around July 31, 2003. (Roberts Dep. at 65). Roberts paid Wilson in cash. Although he did not obtain a receipt, Wilson and Roberts executed a loan document, and Wilson gave Roberts "a lien on part of the money that he had coming to him" that was part of Wilson's "severance he had coming from" the professional baseballs players' union. (*Id*. at 66–67).

2

> the people that were taking lessons in that facility for the last three years. That's the goodwill. He would get all the equipment. He could run the business for three months and keep all the cash, which he did. After the 90 days when I provided to him that with him in that facility he could do $30,000 a month, we would go to the attorneys and sign documents. We wasn't going to sign the document for closing until the 90 days, and I agreed with that.

(Roberts Dep. at 68–69). The alleged oral agreement encompassed the business and not the property. Roberts had leased the property and paid the facility's $5,000 monthly rent. When his leased expired, Roberts expected Wilson to sign a lease with the landowner. Roberts stated in his deposition that Wilson's obligation "was that he was going to work really hard for 90 days. The second part of our deal was to include the contracts." (*Id.* at 69). Roberts claims that Wilson agreed verbally to purchase the business at the end of the ninety-day trial period.

Wilson did not purchase the business at the end of the ninety-day period. Instead, Wilson left the Home Plate facility and began providing baseball instruction at a competing facility owned by Kenneth Vaught. According to Roberts, Vaught enticed Wilson away from Home Plate by promising to build Wilson a new facility and name it after him. Vaught and another individual, Duke Austin, sponsored a local youth league baseball team on which their children played. Soon after Wilson began operating Roberts's Home Plate facility, Vaught began paying Wilson $1,500 a month to provide baseball instruction to the team Vaught and Austin sponsored once a week. (Wilson Dep. at 19–20). From April until June 2003, the team practiced at the "old Home Plate" facility. Wilson, then operating Home Plate for the

ninety-day period under his agreement with Roberts, permitted the team to use the facility for free, because Vaught and Austin were paying him to instruct the team.[3] Wilson testified that beginning in April, he and Vaught frequently discussed Wilson's business arrangement operating the Home Plate facility. (Wilson Dep. at 21–22). According to Wilson, many of these conversations involved Harold "H.B." Bent, a friend of Wilson's. During a lunch in May or June of 2003, Vaught and Austin proposed a new deal for Wilson. According to Wilson,

> [t]hat offer was, "We'll build you the same thing you already have. We'll draw up a contract. It will be your place. You can design it and you can have it for 10 years at $1 a year, do whatever you want. We don't care. We want you to be profitable. . . . At the end of those 10 years you can even have the property." So it was an offer I could not refuse.

(Wilson Dep. at 28–29).

Wilson accepted the deal. He testified that he "went back to work to honor my three-month agreement" with Roberts. Wilson told Roberts of the better offer at the end of May. Roberts, according to Wilson, "seemed to be getting worried, was constantly calling now, wanting to present a contract. And I already knew where I was going." (Wilson Dep. at 29). When Roberts asked about Home Plate's income under Wilson's management, Wilson testified, "I lied. . . . I didn't want him to know how much I was making because I knew he would pressure me into cutting a deal. I don't like to be pressured. And I felt that our verbal

---

[3] Wilson also said that Vaught and Austin were recruiting players by representing that a former pro ballplayer, Wilson, would be the team's coach. Wilson said he agreed only to practice with the team, and not to coach it. (Wilson Dep. at 19–20).

agreement was to agree at the end of three months. I still had the right, according to our verbal agreement, to do whatever the hell I wanted." (Wilson Dep. at 29). Wilson told Roberts that his facility was not making much money, although he believed his friend Bent may have been telling Roberts differently. (*Id.* at 36–37). Bent testified by affidavit that he told Roberts that Home Plate had been very profitable. (Bent Aff., ¶ 7). Wilson testified that when Roberts found out in July 2003 that Wilson had been lying about Home Plate's profitability, "he was pissed." (Wilson Dep. at 89). According to Wilson, by some point before July 22, 2003, Roberts "knew that I wasn't going to stay there," although he denies he was forced out of Roberts's facility. On the evening of July 21, 2003, someone entered the Home Plate facility and removed the cash register, credit card machine, computer, and vending machine. (Bent Aff. ¶ 11). Wilson placed a sign on or near Home Plate's door stating that he was moving to a different facility. Wilson, who had been paying Home Plate's phone bill, transferred the phone number to his new facility.

Vaught's testimony set out a different version of events. Vaught first met Wilson in April 2003, when the coach of the team on which Vaught's children played suggested that Wilson could provide team lessons at Vaught's facility. According to Vaught, Wilson came to him in April asking if he could use Vaught's facility: "I didn't offer to Glenn Wilson. He asked me if he could use the facility. . . I had no objections to that." (*Id.*). When Vaught and Wilson first met, Wilson said that he also gave lessons at Home Plate and suggested that Vaught bring his children over for a series of lessons. Vaught testified that he knew nothing of Wilson's arrangement with Roberts before July 2003 and even then, knew only that

5

Wilson had a ninety-day agreement to work at Roberts's facility. Vaught explained that Wilson's agreement with Roberts was "[n]ot stopping him from coming out and giving lessons. Not from anything." (Docket Entry No. 40, att. A (Vaught Dep.), p. 44). "What Glenn told us is he was on a 90-day trial period and had not made a decision. And we didn't care if he bought it or didn't buy it." (*Id.*). Vaught explained that he and Wilson did not reach an agreement until July 2003:

> Q: Tell me when it was that you decided that Mr. Wilson could come over and officially announce the opening of Glenn Wilson's Field?
>
> A: The week of the World Series in Sulphur, when Glenn said in front of other people that he had received a phone call from H.B., as you refer to him, that he had been kicked off the property by Mr. Roberts and needed to use that facility to give lessons, camps, et cetera.
>
> Q: So you're telling me that prior to the time that Mr. Wilson was "kicked off the property," Mr. Roberts' property, prior to that time, you had not agreed to allow him to open up Glenn Wilson field?
>
> A: I had not.

(Vaught Dep. at 34).[4]

---

[4]

Wilson's tenure with Vaught and Austin did not end amicably. Although Vaught and Austin promised to build a facility, Wilson reported that "it didn't turn out that way. I ended up having to put $30,000 of my own money into the damn thing." (*Id.* at 30). Wilson also complained that Vaught and Austin added Wilson's name to their team's name "so that they could attract more players by using my name." When asked if Vaught and Austin did this without Wilson's permission, he responded, "Big time. They're crooks." (*Id.* at 31). Wilson testified that Vaught and Austin broke several promises and exercised total control over what Wilson believed would be his own facility. For example, while operating the new facility, Wilson complained that Vaught and Austin broke a promise to provide furniture and accountancy services. (*Id.* at 44). Wilson testified that he was not permitted to bring Bent with him to the new facility, or another employee, "[b]ecause he was black." (*Id.* at 42). Vaught and Austin also objected to Wilson hiring his son's girlfriend to work the front counter because of her attire: "Said it wasn't a good image. They were real conscious about the image of my business." (*Id.* at 44). Vaught testified that by November 2003, Wilson was no longer permitted to use his facility. They had never signed the dollar-per-year lease. Vaught testified that he asked Wilson to retrieve his equipment and furniture. Wilson testified that Vaught told him to retrieve his

According to Wilson, both Vaught and Austin knew about Wilson's ninety-day arrangement with Roberts, but encouraged him to disregard it. Wilson testified as follows:

> Q: Did. . . Mr. Vaught or Mr. Austin have any comment or saying anything about your agreement during that three-month period?
>
> A: Yeah.
>
> Q: What did they say?
>
> A: You don't have to do anything. You can do whatever you want to do if you hadn't signed anything. Not to worry about it. They played Mr. High-roller. They are want-a-bees.
>
> Q: What do you mean by that?
>
> A: Want-a-bees are what major league baseball players call people that want to be celebrities that have a lot of money.

(Wilson Dep. at 27).[5]

Wilson's testimony differs from Vaught's in other respects as well. Wilson testified he had frequent conversations with Vaught, starting in April 2003, about Home Plate's profitability under Wilson's management. Vaught categorically denies this.

> Q: Did Mr. Wilson ever tell you how much money he was bringing in over there at Home Plate every month?
>
> A: He did not.

---

property, and then refused to unlock the facility unless Wilson signed a release promising not to sue Vaught. (Wilson Dep. at 51, 90). Wilson testified that he did not sign the release.

[5] In June 2003, Wilson traveled to Philadelphia for his former baseball team's "All Century Team" event. Wilson reported that the Vaught and Austin families "got on the same flight I was on. I really didn't want them to go." According to Wilson, the families traveled on the team bus from the hotel to the stadium. Wilson testified that during that trip, Vaught was so pleased to be on the trip, he offered to buy or build Wilson a house. (Wilson Dep. at 32–34).8

7

Q:    Did you call and ask?

A:    No, I didn't.

Q:    You never talked to H.B. and asked him, "What are you guys doing over there"?

A:    No, I did not.

Q:    [Wilson] didn't tell you he was making $30,000 a month over there?

A:    No, he did not.

(Vaught Dep. at 49–50). Wilson testified that Vaught "sweetened the deal" by proposing an expansion of the facility to add new buildings, rent them out, and split the profits. (Wilson Dep. at 31–32). Vaught denies this. Asked if it was his understanding that Wilson "would be bringing customers with him" to be instructed at Vaught's facility, Vaught responded, "I did not know and did not care. It was only for our team—that I was doing one team." (Vaught Dep. at 63). Wilson testified that Vaught told him to keep the phone number he had used at Roberts's facility. (Wilson Dep. at 40). Presented with a telephone bill addressed to Vaught's facility—but with the name of Roberts's company, Home Plate—Vaught testified that he did not recognize the number and had never talked with Wilson about the telephone number. (Vaught Dep. at 64–65).

In the original complaint filed on October 2, 2003, Roberts, Roberts Plate, L.L.C., and Bent sued Wilson and Vaught. The complaint included a cause of action for breach of contract against Wilson and causes of action against both defendants for: (1) common law copyright infringement; (2) trade name infringement; (2) unfair competition under the

Lanham Act and at common law; (5) business defamation, libel, and/or slander; (6) tortious interference with contract and prospective economic expectancy; (7) conversion; (8) negligence and gross negligence; and (9) civil conspiracy. (Docket Entry No. 1). Vaught answered on November 28, 2003. Roberts never served Wilson.[6] Vaught filed an amended answer on December 8, 2004, and crossclaimed against Wilson on December 10, 2004.[7]

On January 28, 2005, Vaught moved for summary judgment. According to that motion, "[o]n or about December 21, 2004, Roberts filed a first amended complaint that (1) dropped all claims except those under the Lanham Act, unfair competition at common law, tortious interference with existing and prospective contract, and civil conspiracy; and (2) deleted Bent as a plaintiff; and (3) purportedly deleted Wilson as defendant." (Docket Entry No. 34, p. 8). Although Roberts ostensibly filed this amended complaint in December 2004, no such complaint was docketed in this court. Vaught moved for summary judgment and attorneys' fees on the claims Roberts asserted in this amended complaint. (Docket Entry No. 34). Roberts clearly served this amended complaint on defense counsel, because Vaught moved for summary judgment only on the causes of action set out in the amended complaint: Lanham Act, unfair competition, tortious interference, and conspiracy.

---

[6] Roberts testified that he dropped Wilson from his lawsuit after Wilson apologized to him. (Roberts Dep. at 71–72). Vaught asserts that Wilson's deposition testimony "gave a different version of events than he had previously given, in such a way that was suspiciously favorable to plaintiffs, almost tracking some of the elements of plaintiffs' cause of action." (Docket Entry No. 34, p. 8).

[7] The crossclaim asserts contribution, fraud, and negligent misrepresentation. (Docket Entry No. 25). Vaught served Wilson, who answered the crossclaim. (Docket Entry Nos. 27, 28).

9

## II.     The Applicable Legal Standards

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  *See* FED. R. CIV. P. 56.  Under Rule 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Stahl v. Novartis Pharmaceuticals Corp.*, 283 F.3d 254, 263 (5th Cir. 2002).  The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.  *Exxon Corp. v. Oxxford Clothes, Inc.*, 37 F.3d 1070, 1074 (5th Cir. 1997).  If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response.  *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings.  *See Prejean v. Foster*, 227 F.3d 504, 508 (5th Cir. 2000).  The nonmovant must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial.  *See id*.  The nonmovant must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Webb v. Cardiothoracic Surgery Assocs.*, 139 F.3d 532, 536 (5th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986)).  "The mere existence of a scintilla of evidence in support of the plaintiff's position

will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable to the nonmovant. *Cabillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002); *Anderson*, 477 U.S. at 255. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

## III.   Analysis

Vaught has moved for summary judgment on all the claims Roberts asserted in his unfiled-but-served amended complaint. This court finds summary judgment appropriate on the Lanham Act claim, Roberts's sole federal law claim, and dismisses the remainder of the case without prejudice to refiling in state court.

### A.   The Lanham Act Claim

Vaught argues that Roberts lacks standing to sue for Lanham Act violations because Roberts did not allege that he possesses a trademark or trademark that is registered or capable of registration under the Act. In response, Roberts states that he "owns a common law trademark for Home Plate that is eligible for protection." According to Roberts, his purchase of Home Plate's assets included its trade names and trademarks. Roberts attached a copy of

11

the trademark and asserts that the trade name "Home Plate" is "recognized in the community and associated with" his facility. (Docket Entry No. 40, p. 25). Roberts then states, "[h]owever, as stated above, the primary claim Plaintiff intends to make here is unfair competition. Plaintiff is therefore willing to dismiss the Lanham Act claim without further argument as it is unnecessary to the substance of the claim being made and the liability of Defendant for unfair competition." Given this statement, this court grants summary judgment dismissing the Lanham Act claim.

### B. The Remaining Claims

Under 28 U.S.C. § 1367(c)(3), when federal law claims that serve as the basis of subject matter jurisdiction are dismissed and only state law claims remain, a district court has broad discretion to dismiss the state law claims without prejudice to permit them to proceed in state court.[8] *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350–52, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988); *see also Brown v. Southwestern Bell Telephone Co.*, 901 F.2d 1250, 1254 (5th Cir. 1990) ("[T]he decision as to whether to retain the pendent claims is within the

---

[8]

28 U.S.C. § 1367(c) provides that:

[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1) the claim raises a novel or complex issue of State law,
(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
(3) the district court has dismissed all claims over which it has original jurisdiction, or
(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

sound discretion of the district court."). A court considering whether to continue to exercise supplemental jurisdiction over such state law claims must consider the provisions of section 1367(c) and the factors the Supreme Court outlined in *Cohill*, 484 U.S. at 350–51, and *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S. Ct. 1130, 16 L. Ed.2d 218 (1966). *See Smith v. Amedisys Inc.*, 298 F.3d 434, 447 (5th Cir. 2002). Those factors include judicial economy, convenience, fairness, and comity. *Id.*; *see also Jones v. Adam's Mark Hotel*, 840 F. Supp. 66, 69 (S.D. Tex. 1993). The "general rule" is to decline to exercise jurisdiction over pendent state-law claims when all federal claims are eliminated from a case before trial. *Amedisys*, 298 F. 3d at 447, *citing Batiste v. Island Records Inc.*, 179 F.3d 217, 227 (5th Cir. 1999). This rule is neither mandatory nor absolute. *Id.* The dismissal of the plaintiffs' federal claims "'provides 'a powerful reason to choose not to continue to exercise jurisdiction,'" although "no single factor is dispositive in this analysis." *Id.* (quoting *McClelland v. Gronwaldt*, 155 F.3d 507, 519 (5th Cir. 1998)).

In *Sibley v. LeMaire*, the Fifth Circuit affirmed the district court's decision to decline jurisdiction over the plaintiff's remaining state law claims after dismissing the plaintiff's sole federal claim, asserted under section 1983. 184 F.3d 481 (5th Cir. 1999). The appellate court noted that although the federal court had engaged in lengthy proceedings and had granted summary judgment, "there remained the need for a full-blown jury trial" on the remaining state claims. The Fifth Circuit found no abuse of discretion in the "district court's decision not to conduct that trial in federal court." *Id.* at 490.

In *Amedisys*, the Fifth Circuit affirmed the district court's decision to retain

13

jurisdiction over the plaintiff's remaining state law claims after dismissing the plaintiff's Title VII claims. 298 F.3d at 447. The appellate court noted that the remaining claims did not involve "novel or complex" issues of state law and that there were no "exceptional circumstances" for refusing to retain jurisdiction. *Id.* (*quoting* 28 U.S.C. § 1367(c)). On the other hand, state law claims predominated and the federal court had dismissed the only federal claims. With the statutory factors in equipoise, the appellate court emphasized that the factors of judicial economy, convenience, fairness, and comity "weigh[ed] heavily toward retaining jurisdiction." *Id.* The case had been pending for nearly three years, the parties had taken numerous depositions, and the matter had progressed to advanced stages of litigation. The district court had "devoted many hours" in reaching the decisions in its "comprehensive summary judgment ruling." The Fifth Circuit explained that the trial court had "substantial familiarity with the merits of the case," noting that the trial court had expended considerable resources reviewing the parties' memoranda, exhibits, and record and to researching the issues involved in the case. *Id.* (quoting *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 587 (5th Cir. 1992)). The district court's decision to retain jurisdiction was not an abuse of discretion.

Under a similar analysis, in *Batiste*, the Fifth Circuit concluded that the district court had abused its discretion in declining jurisdiction over pendent state law claims after entering summary judgment on all the plaintiffs' other claims. 179 F.3d at 227–28. The appellate court determined that the remaining claims did not involve any "novel or complex" issues of state law and that the factors of judicial economy, convenience, and fairness to the parties

14

strongly weighed in favor of retaining jurisdiction. *Id.* at 227. The court noted that the case, which had been pending for nearly three years, had involved numerous depositions, discovery disputes, and motions. *Id.* at 227–28. "The familiarity of the district court with the merits of the [plaintiffs'] claims demonstrates that further proceedings in the district court would prevent redundancy and conserve scarce judicial resources." *Id.* at 228.

This case more closely resembles *Sibley* than *Amedisys* or *Batiste*. Although the case presents no complex or novel issues of state law, this court has dismissed the only claim over which it had original jurisdiction. *See Cohill*, 484 U.S. at 351 ("When the single federal-law claim in the action was eliminated at an early stage of litigation, the District Court had a powerful reason to choose not to exercise jurisdiction."). As Vaught has noted, this claim provided the only reason to invoke the power of the federal courts, and Roberts "nonchalantly" discarded it in his summary judgment reply "without further argument." The remaining state claims substantially predominate, because no claims remain over which this court has original jurisdiction. There are no "exceptional circumstances" or "compelling reasons" for declining jurisdiction. Two statutory factors weigh in favor of retaining jurisdiction, and two statutory factors weigh against retaining jurisdiction. 28 U.S.C. § 1367(c)(1)–(4).

The factors of "judicial economy, convenience, fairness, and comity," *Amedisys*, 298 F.3d at 447, weigh in favor of dismissal. This court finds that neither party would be inconvenienced greatly by dismissal. Although the case was filed in 2003, both parties have, at different times, requested continuances and sought to extend filing deadlines. (Docket

Entry Nos. 18, 38). Roberts did not serve his amended complaint until the end of 2004 (and has yet to file the amended complaint with this court). Vaught did not crossclaim against Wilson until December 2004. (Docket Entry No. 25). Although Vaught moved for summary judgment in January 2005, Roberts did not respond until several weeks after the response deadline had passed. (Docket Entry Nos. 38–40). This court has not yet set a trial date. There is no basis on this record to retain jurisdiction over Roberts's state law claims, now that the only federal claim has been dismissed. *See McClelland v. Gronwaldt,* 155 F.3d 507, 519–20 (5th Cir. 1998) ("[W]hen all federal claims are dismissed or otherwise eliminated from a case prior to trial, we have stated that our 'general rule' is to decline to exercise jurisdiction over the pendent state law claims."); *Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir. 1989) ("Ordinarily, when the federal claims are dismissed before trial, the pendent state claims should be dismissed as well.") (citing *Gibbs*, 383 U.S. at 726, 86 S. Ct. at 1139)).

**IV.    Conclusion**

The motion for summary judgment is granted in part. Roberts's Lanham Act claim is dismissed with prejudice. The remaining state law claims are dismissed without prejudice to refiling in state court. Vaught's motion for attorneys' fees is denied.

SIGNED on June 6, 2005, at Houston, Texas.

_____
Lee H. Rosenthal
United States District Judge

16